Loring, J.,
delivered the opinion of the court:
The petitioner claims one-half of the net proceeds of twelve hundred and ninety-three bales of cotton. And the court finds the facts to be—
1. That the petitioner, Edward Padelford, is a citizen of Savannah, in the State of Georgia j and, in December, 1864, he and Randolph Mott, in the State of Georgia, jointly and as tenants in common, owned .and were possessed of twelve hundred and ninety-three bales of cotton then stored in the city of Savannah.
2. That, in said month of December, 1864, the said cotton was seized by the United States, and by them taken from the possession of said Padelford Mott and sold, and the net proceeds thereof, amounting-to $246,277 70, paid into the Treasury.
' 3. That, in March, 1866, the said Padelford and Mott presented their joint petition in this court praying judgment against the United States for said net proceeds paid into the *320 treasury as aforesaid; and thereafter, by leave of this court obtained, the said Padelford and Mott were allowed to sever in their claim and to sue severally for their respective rights; and, on 13th April, 18G8, the said Mott, suing solely, recovered judgment against the United States for his share of said net proceeds, being one-half part thereof and amounting to the sum of $123,138 85, and the said Padelford continued his suit in this court for his several claim and on his sole right, upon the amended petition now before the court filed in April, 1867.
4. That Mr. Padelford was of northern birth, but early in life he established himself in business as a merchant in Savannah, and there earned the respect, influence, and wealth that made him eminent among his fellow-citizens.
5. From the beginning of the rebellion to the end of it Mr. Padelford was consistently .opposed to it in sentiment, speech, and action, and his feelings and opinions were openly avowed.
6. During the rebellion the municipal government of the city of Savannah, and its people generally, earnestly supported the rebel cause, and held as public enemies those few of its citizens who maintained and avowed their loyalty to the Union; and, in the early part of the rebellion, the manifestation of such loy-altyincurred persecution and violence from the excited'populace, and in some instances loyal citizens were seized and whipped and tarred and feathered by bands of men formed of the worst part of the community and organized for their political purposes ; and this state of things continued until early in 1862, when a military night police was established by the commanding general of the confederate forces.
7. Mr. Padelford, from his known sentiments, was subjected to the surveillance of the public authorities and the suspicions of the people supporting them. He was placarded in the streets as a public enemy and designated in the newspapers as a fit subject for condign punishment, and his best protection was the respect attached to his personal character.
8. In the early part of 1861 a subscription for a loan of fifteen million of dollars to the Confederate government was opened in the city of Savannah, and all persons were expected and required to subscribe to it who were able to do so, and declarations and threats were publicly made that all who did not subscribe vol- ' untarily should be made to subscribe. These threats were openly made at the place of subscription and by persons influ *321 ential with, the populace. Mr. PadelfordAs name was mentioned, Ms absence was remarked upon, and inquiries were made as to wliere be was, and it was publicly threatened that if the Marine Bank, of which he was a director, did not subscribe liberally it should be pulled down. Mr. Padelford was informed of these things and advised to subscribe to the loan because of them by friends, loyal as well as rebel, and, under these threats and the pressure of circumstances stated, he subscribed $2,000 to the loan, and declared he did it unwillingly and because of the public excitement, and he sold out the stock he had subscribed for in two weeks after.
9. The Marine Bank of the city of Savannah was, in 1861, under the direction of northern men, and Mr. Padelford was one of its most influential directors and largest stockholders; and when the other banks of Savannah increased their capital stock and lent their funds to the aid of the Confederacy by exchanging them for Confederate notes and securities, the Marine Bank objected to doing so, and, instead, contracted its business for its own security. This conduct and the knoivn loyalty of many of the directors of the bank subjected it to public odium, and it was nicknamed the Yankee Bank. At the time the subscription to the loan was opened in Savannah the political excitement was at its highest point, and it was, as has been stated, publicly threatened that if the bank did not subscribe liberally it should be pulled down.' Under these threats and the pressure of the circumstances stated, the bank subscribed $100,000 to the confederate loan, and this was the least it could subscribe according to its capital; and its refusal to subscribe would have endangered the bank and its directors; but Mr. Padelford opposed the loan made, (p. 68,) and from that time absented himself for the most part from the meetings of the directors, on the ground that the course of the bank was controlled by outside pressure.
It was objected on the part of the United States that the original petition in this case was brought before the “ two years after the suppression of the rebellion,” (Act 12th March, 1863,12 Stat. L., p. 820, § 5,) had expired, and therefore was prematurely brought. But we are of opinion that this objection is not maintainable. The provision of thestatutewasmade for the protection and convenience of the United States, that they might not be called upon to answer claims before they were ready to do so.. *322 And tlie objection is in tlie nature of a plea in abatement, and lite that is not to be entertained after pleading’ to the merits. And in this case the United States, instead of taking the objection when the claim was filed, joined issue, concurred in the taking of testimony, made stipulations in relation to it, cross-examined witnesses adduced by the claimants in Georgia and elsewhere, continued the case from term to term for years, filed briefs, declared themselves ready for trial, and finally went to trial on the law and the facts, and withheld the objection made now till after the case had been twice argued and then submitted to the court for its decision.
Besides this, the original petition, without objection by the United States, remained on the docket until the “ two years after the suppression of the rebellion” had expired, and thus ripened there into an action perfectly legal in form, and substance. And then an amended petition was filed in 1867 setting forth the claim in full and competent for its maintenance and entirely beyond the objection made; and then, by stipulation between the parties, this petition was so amended as to pray for the severance of the claimants’ claims and several judgments thereon. And the severance was adjudged, and the claim of Mr.' Mott was heard and adjudged on his sole suit, and Mr. Padelford’s claim was continued on his sole suit to this term. And all this appears on our record, which thus shows us that this claim is as a several claim — a different claim from that proffered for litigation in the joint petition to which the objection is made. Then the objection is merely technical, for it cannot be pretended that the United States have suffered inconvenience from the filing of the original petition, and the 32d section of the judiciary act of 1789, c. 20, enacts that no process or judgment in civil causes in any of the courts of the United States shall be abated or quashed for any defect or want of form, but that the courts shall proceed and give judgment according to the right of the cause. We overrule the objection.
It is also objected that the claim is preferred by the claimants jointly as a single claim and an entirety.” This allegation ignores our whole record, because that shows that the •claim of Mott and Padelford has been severed and judgment recovered by Mr. Mott for his several claim, and that this suit is for the several claim of Mr. Padelford. We overrule this •objection.
*323 Tlie only remaining subject for consideration is the claimant’s loyalty to the United States. His general reputation for loyalty, his fixed adherence to the Union in sentiment and feeling-, his steadfast disapproval of the rebellion and of every step taken by those of his fellow-citizens who supported it, are not, and, on the evidence, canftot be questioned; and, by the rules of evidence, general character is the means for construing particular acts. Common justice, the common law and common sense give to every man the benefit of a well-spent life, and in that they seek and find the motive of a particular act which is to take its quality from its motive.
The particular act urged most strenuously against the claim of Mr. Padelford is that he subscribed $2,000 to the Confederate loan. Our conclusion is that this was not voluntary, but was enforced upon him by a peril 'of property and person, imminent, direct, and actually seeking him, whose violence and consequences he could not measure beforehand, and against which he had no protection, and resistance to which would be unavailing. I have only to state now tlie evidence on which that conclusion was reached.
It must be remembered that the peril was from an excited populace, engaged in a civil war, which involved their sectional feelings and all their interests of property and life, and roused the fiercest and worst passions of human nature, and turned them most fiercely on their opponents in their own community, whom they held to be traitors as well as enemies. And the action of this excited populace was by organized bands of bad men, beyond the control of authority for the time, and following those whose excess of violence made them leaders.
And what the action of such lawless and impassioned bands might be, none could foresee. No man could know that their violence would express itself only in insult, or wreak itself only on i>roperty, or that, under the excitement which would grow with its own action, it would stop short of bloodshed and life. And he who is exposed to the violence of a mob has the same right to purchase his safety by compliance with its requirements, that he has to soothe a madman whose outburst of frenzy might cost him his life. And in the one ease, as in the other, it is the presence of the peril thatjustifi.es submission to it, for that may be too late when the action of the peril has begun and the madness has broken out.
*324 Now the condition of the city of Savannah, when, in 1861, Mr. Padelford subscribed to the loan, and the direction of its excitement towards him personally, are thus shown by the evidence.
Mr. Lewis A. Bennett, says: “Mr. Padelford was no more exposed than others to molestation — probably not so much so, from the very high position he had reached in the community. I never was frightened for myself, although other men were taken up and carried out, whipped, and tarred and feathered, for their Union political sentiments. These were the acts of organized bodies composed of the lower classes of society. This state of things continued until early in the year 1862, when the military night police was established by the commanding general of the confederate forces.’*
Mr. John B. Lovell says: “I was intimately associated with Mr. Padelford during the whole‘of the war. He was during the whole of that time loyal to the United States of America in his avowed sentiments and opinions. Frequently during the war I communicated to Mr. Padelford the threats which had been made towards the Union men living in the city of Savannah. The leader of one of these organized bands who were using violence towards the Union men of the city, was named Perry, and was a Massachusetts man. He was the most violent of all of them. These organizations were purely of a political character, and used only against Union men. If Mr. Padelford or myself, or any other Union man living here during the war, had shown their loyalty to the United States by any overt act during the war, they certainly would have periled life, limb, and property.”
That the susi>icions of these organized bands was directed towards Mr. Padelford, and his motives for subscribing to the loan, are thus testified to by Mr. Cope, an officer in the confederate service. On his direct examination he said :
“ Mr. Padelford subscribed $2,000 to the fifteen million loan of the Confederate States. I told him if he did not do it the people would run him out of the city. Mr. Padelford told me at the time that he did not wish to do it, but that the excitement was so great that he was compelled to do it. He kept the bonds about two weeks and sold them.”
On his cross-examination he said:
“ I am inclined to think it was through my influence that Mr. Padelford subscribed to what was known as the fifteen million *325 loan. According to my recollection be subscribed $2,000. I went myself to subscribe to tbe loan and subscribed $500, at wbieb time I was asked where Mr. Padelford was, and remarks were made at tbe time about bis absence. And I also beard it remarked that if tbe Marine Dank (of wbieb Mr. Padelford was a director) did not subscribe liberally, that tbe bank would be pulled down. These remarks were made by a gentleman of great influence, but who is now deceased. I know of no actual violence or acts to intimidate Mr. Padelford, but I mentioned to him these remarks, and then be went and subscribed.
Mr. Hardee says:
“1 think I bad more communications with Mr. Padelford in relation to the war than any other man in Savannah. Edward Padelford, as far as I know, subscribed to the fifteen million loan. I advised him to do it on account of tbe state of public feeling in regard to tbe matter. Tbe advice was given on my part as I considered it policy, not knowing what might be done.”
This testimony of those who supported and those who did not support tbe rebellion, shows the popular excitement in Savannah at tbe time, and tbe relation of that excitement to Mr. Pad-elford. And tbe last words of tbe last witness, “.not knowing what might be done,” describes exactly that uncertainty as to consequences which in such a time of lawless public'excitement authorizes a citizen to avert its outbreak on him by prompt submission to it, without an imputation on. bis loyalty to tbe government, which in tbe circumstances cannot protect him.
Tbe facts in relation to tbe Marine Bank, to its subscription to tbe loan, and Mr. Padelford’s connection with that, are stated by tbe president and officers of tbe bank, and from their personal knowledge.
Mr. A. Champion, tbe president of the bank, says : I was president of tbe Marine Bank of Georgia, and I am aware that there was but one loan to tbe confederate government, which was during tbe early part of tbe war. I further add, that if tbe loan bad not been made tbe bank would not have been safe. It' was called tbe Yankee bank, tbe directors being generally opposed to such investments. * * Tbe reason why tbe bank did not take these loans was that tbe directors were not interested in tbe war and a majority of the directors were Union men; all but one were northern men by birth.”
*326 N. A. Hardee, says :
“ There was a loan known as the fifteen million loan, to the confederate government, to which the Marine Bank of Georgia (of which Mr. Padelford was a director * * ) contributed. I swear positively that Mr. Padelford was opposed to the loan. And furthermore, the excitement here was very great, and there was no telling what would have been the consequences had the bank refused to make the loan. I was one of the directors of the bank at the time. ' I think the loan of .the bank was $100,000 — the least amount that could have been taken according to the capital of the bank. * * * At the time the loan was made by the Marine Bank the excitement was at its highest point, and if directed by any leading individual against the bank, had it refused to make the loan, it may have, and probably would have, resulted in a disaster to the bank and possibly to the directors personally. The weig'ht and influence of no man or combination of Union men could have resisted the popular -feeling here during the war. Any attempt to do so would have been as futile as an attempt to stop the current of the Savannah Elver with his little finger. At that time I do not think it would have been safe for any Union man to have publicly declared his sentiments in favor of the United States.”
Mr. W. P. Hunter, the cashier of the bank, says :
“ When I went around, as cashier of the bank, to subscribe $100,000 to the above loan, one of the commissioners (of the loan) said to me, that is coming out something like; the public feeling was against the bank; the bank was deemed quite unpatriotic, so far as the Confederacy was concerned. Whatever was done by the bank in aid of the Confederacy was done from outside pressure. I knew from sitting with the board of directors and hearing their conversation that a majority of the board was governed by outside pressure. * *■ * My belief and impression is that if the bank had not acted as it did in these transactions, it would have been subjected to violence. I based this impression and belief on what I knew, and saw, and heard, of the temper and disposition of the people of this community against the bank.”
And then referring to the matter before specified and to Mr. Padelford, he says: "His visits at the bank, from being daily became quite infrequent, having lost much of his interest in the *327 management of tbe bank and taking no active part in these particular transactions.”
It was claimed by the special counsel for the United States, that Mr. Padelford “ performed the acts in question from motives of personal policy, looking only to the pecuniary advantage of himself and his bank.” We have found otherwise. But if it were so, Mr. Padelford had a right to look to his pecuniary advantage and to surrender a part of his property to assure the safety of the rest. And this motive would of itself legalize his act and redeem it from any color of treason or disloyalty, because it would make it only an enforced contribution of a part of his property to a public enemy who had the whole of it in his p'ower. Such enforced contribution would be, as it always is, aid and comfort to the enemy. But it would not be voluntary aid, and by the adjudication of this court in the case of Margaret Bond, it is voluntary aid and comfort which the statute of March 12, 1863, requires for the exclusion of a claimant under it. And such construction of the statute only follows the common law and the statute law of England and this country, as they have been always administered; and the criminal jurisprudence of every country claiming Christian civilization or any other, and the principle which, in the words of Justice Story, “has grown hoary with the veneration of ages;” and which has come down to us from enlightened paganism in the maxim mens sit rea.” And if the statute of 12 March, 1863, is to be so construed, then so is the statute of June 25, 1868, c. 71, which prohibits aid or comfort to persons engaged in the rebellion, for the two statutes are in pari materia, and are to be construed together.
And we hold, as a conclusion of law, that the acts of the petitioner above specified do not bar his recovery, because they were done not voluntarily but under a reasonable fear of violence to his person and property.
And we find 'that the claimant, Edward Padelford, is entitled to judgment against the United States for the sum of $123,138 35.